## In re B.B. and A.M.

C.P. of Berks County, nos. CP-06-DP-211-2009 and CP-06-DP-212-2009.

*Mary C. Favinger,* for Mother.
*Jennifer L. Grimes,* for BCCYS.
*Cathy M. Badal,* guardian ad litem for B.B. and A.M.

SCHMEHL, P.W., *J.,* February 12, 2010—This matter came before the court on dependency petitions filed by

Berks County Children & Youth Services (BCCYS), which sought a judicial determination as to whether the children, B.B., date of birth April 20, 2007, and A.M., date of birth March 23, 2009 are dependent children as defined by the Juvenile Act at 42 Pa.C.S. §6302. The children's mother is R.M.J. (Mother). B.B.'s father is M.B., and A.M.'s father is E.M. (Father). M.B. has not been involved in the matter. Mother and her then only child came to the attention of BCCYS on June 2, 2008. The dependency petitions were filed on November 25, 2009.

The petitions aver that the children are dependent under 42 Pa.C.S. §6302(1), which defines "dependent child" as one "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk." BCCYS further specifically averred it to be contrary to the welfare, safety and health of the children to remain under the care of Mother.

When Mother and her 1-year-old child, B.B., came to the attention of BCCYS in June 2008, the report was that Mother was without a home, moving from friend's house to friend's house. Six weeks later she confirmed with the BCCYS caseworker that she was moving again because Father, one of the people with whom she was living, had threatened her and their unborn child. Two weeks later,

at the end of July 2008, she moved again into the home of her mother; however, Mother claimed to BCCYS that she was living at both her mother's home and Father's house. During all of this time, Signature Family Services was attempting to set Mother up with housing through Mary's Shelter. Although Mother had a series of objections to Mary's Shelter, she maintained sufficient interest that Signature Family Services and BCCYS made a series of efforts to coordinate and acquire housing at Mary's Shelter. When these agencies succeeded in January 2009, Mother turned it down, preferring instead to move back in with Father, despite both parties lacking participation in domestic violence treatment.

In August 2008, BCCYS informed Mother that she and Father would need to cooperate with a domestic violence evaluation and recommended services. Their cooperation was poor.

In October 2008, BCCYS learned that Father had bought a gun and was using it to intimidate Mother. Less than a month later, Mother and Father indicated to BCCYS that they wanted to go to couples counseling rather than be evaluated by Berks Advocates Against Violence; however, they relented and agreed to the evaluations. Both were recommended for ongoing services.

In early December 2008, Mother again moved, this time out of her mother's home and back in with Father and his mother. A month later, Mother was again moving out because Father had hit her again. She stayed with her mother who ousted her the next day after an altercation. Two weeks later, Mother and Father had rented an apartment together.

Despite efforts made by BCCYS to encourage Mother's participation in domestic violence counseling, Mother resisted by attempting to arrange counseling with a different provider and then failing to follow through, canceling appointments. Even after BCCYS organized a family decision making meeting where Father agreed to arrange domestic violence counseling by a certain date, he failed to do so.

In March 2009, when Mother was giving birth to A.M., Father felt that it was the appropriate time to yell at Mother about getting a paternity test and other issues such as child support and created such a horrible scene that hospital personnel had to remove Father.

In April 2009, Mother, Father and the children left their apartment and moved back in with Father's mother. Another domestic dispute occurred and Father kicked Mother out of the home. Thereafter, Mother informed BCCYS just how controlling Father can be, not allowing her to make phone calls, have her own key to the home, or even control the money even though she was the only one working. Mother claimed that Father threatened her that he would take A.M. and never let her see the child again. Mother initiated the process of obtaining a protection from abuse order, but failed to follow through because she did not want keep Father from seeing the child. As of April 21, 2009. Father still had not scheduled any domestic violence treatment.

In May 2009, the family moved back in together at the home of Father's mother. Mother also informed BCCYS that she wanted to choose yet another provider for domestic violence counseling. Less than a month later, Mother was reporting to BCCYS that she was getting a PFA on Father because he flashed his gun at her brother,

that Father was upset because he wanted to take A.M. to a friend's house to smoke weed, and that Father felt the child would not be inappropriately exposed to second hand marijuana smoke because he had plan of covering the child's face with a blanket. Mother also admitted to Father's punching her in the stomach when she was pregnant, spitting in her face, and often pulling her hair. Within the week, BCCYS learned that the family went to the beach together, although there was a PFA on Father.

On or about June 19, 2009, Mother and the children moved in with Mother's cousin. By September, Mother was kicked out of the home because the cousin believed Father was inappropriately disciplining B.B. and Mother did not agree. BCCYS also learned on June 19, 2009 that Mother had dropped the PFA against Father. Through the remainder of 2009, Mother continued to change her preference for the provider of domestic violence counseling, continued to be without stable housing, and continued to maintain a relationship with an abusive paramour.

Ultimately, BCCYS file a dependency petition because of its belief that the children would not be safe in Mother's home because she cannot provide a protective factor against her abusive boyfriend.

At the hearing on the petition, Mother's counsel elicited testimony from the BCCYS caseworker that there was a period of time when the case had been closed because of Mother's and Father's display of an end to the relationship. If in fact such a display was accurate and not simply an exercise of misdirection to end the involvement of BCCYS, it would seem that Mother does not have the ability to stay away from this dangerous

man. Also, on cross-examination, the caseworker indicated that he was recently informed of Mother's obtaining an apartment and engaging in domestic violence counseling. It was clear to the court that the caseworker was not confident that these last minute efforts were genuine and anything other than an insincere last ditch attempt to prevent removal of the children from her care.

In concluding the hearing on the dependency petition, respective counsel for Mother and Father made arguments that their clients were on track to improve their lives by starting domestic violence counseling, enrolling in classes at RACC (Father), and expressing a willingness to participate in services. BCCYS and the children's guardian ad litem countered that this pattern is nothing new.

Mother and Father never took the stand to testify as to their efforts to take advantage of the services offered to them, their efforts to stabilize their and consequently the children's living arrangements, or the steps that they have allegedly taken or intend to take to protect themselves and more especially the children from being victims or witnesses to domestic violence.

All indications from the testimony provided were that the children are not safe in Mother's care and even less so if they were to be in Father's care. Neither Mother nor Father presented any case to the contrary. Mother and Father have failed to provide care and control necessary for the children's physical, mental and emotional health and morals, and to not declare the children dependent and to not remove the children from the care and custody of Mother and Father would be to condemn them

to a nomadic life of domestic violence that would leave them scarred, if not physically at least emotionally and morally. Clearly the health, safety and welfare of the children are at risk so long as they are in the custody of Mother who does not have the common sense to stay away from a violent and controlling man who is no worthy role model for a child.

For the foregoing reasons, the court found the children to be dependent and in need of placement.